IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

ZIMMER MELIA & ASSOCIATES, INC.;　)
and ZIMMER U.S., Inc.　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　Plaintiffs,　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　)　　No. 3:08-0663
　　　　　　　　　　　　　　　　　)　　Judge Nixon
KIRKLAND C. STALLINGS; and　　　　)　　Magistrate Judge Knowles
STALLINGS & ASSOCIATES, LLC,　　　)
　　　　　　　　　　　　　　　　　)
　　　　Defendants.　　　　　　　　)

## ORDER

Pending before the Court is Plaintiffs' Motion for Preliminary Injunction Against

Defendants ("Plaintiffs' Motion") (Doc. No. 9) and Memorandum in Support (Doc. No. 10).

Defendants have submitted a Response in Opposition to Plaintiff's Motion (Doc. No. 24), and

Plaintiffs have filed a further Reply to Response to Plaintiff's Motion (Doc. No. 43). A hearing

was held on Plaintiffs' Motion on July 30, 2008 ("hearing"). See (Doc. No. 42). For the reasons

stated below, Plaintiffs' Motion is **DENIED**.


I.　　**PROCEDURAL BACKGROUND**

Plaintiffs filed suit on July 3, 2008 raising claims under contract and tort law. (Doc. No.

1). Jurisdiction in this Court is proper under 28 U.S.C. § 1332(a). Defendants' Answer was

submitted on July 28, 2008. (Doc. No. 38). On July 11, 2008, Plaintiffs filed an Amended

Complaint (Doc. No. 8) and the Motion for Preliminary Injunction (Doc. No. 9) that is the

-1-

subject of this Order. Plaintiffs seek a preliminary injunction against Defendant Kirk Stallings' alleged violation of a non-compete covenant entered into with Plaintiff Zimmer Melia & Associates, Inc. on grounds of breach of contract and promissory estoppel.

## II.     FACTUAL BACKGROUND[1]

### 1.     Parties

Plaintiff Zimmer U.S., Inc. ("Zimmer U.S.") is a medical product manufacturer which specializes in orthopaedic implants, primarily replacement hips and knees. Plaintiff Zimmer Melia & Associates, Inc. ("Zimmer Melia") is an independent medical product distributor under contract with Zimmer U.S. Collectively, for purposes of this Order, Plaintiffs are referred to as "Zimmer."[2]

Fields Medical Corporation ("FMC") and Fields and Stallings LLC ("F&S") are independent medical product distributors which did business in essentially the same territory as Zimmer Melia. Randy Fields ("Mr. Fields") owned FMC outright and was 51% owner of F&S. Defendant Kirk Stallings ("Mr. Stallings") was Sales Manager of FMC and 49% owner of F&S.

Biomet Orthopedics, LLC ("Biomet") and Zimmer U.S. are direct competitors in the manufacture of orthopedic implants.[3] Biomet is not a party to the instant suit.

_____

[1] All facts in this section are undisputed. At the hearing on Plaintiffs' Motion, the parties agreed that the material facts in regard to Plaintiffs' Motion were not in dispute, and are to be taken from the parties' pleadings, declarations, and affidavits. Accordingly, facts in this section are derived from Plaintiffs' Memorandum and attachments (Doc. No. 10), Defendants' Response and attachments (Doc. No. 24), the Declarations of Randy Fields, Michael Melia, and Jon Kramer, and the affidavits of Kirkland Stallings, Robert Hall, Chaye Hart and Greg Mays.

[2] Under the terms of all relevant contracts as interpreted under relevant law, Plaintiffs have identical, co-extensive rights against Defendants for purposes of this Order.

[3] Zimmer U.S. and Biomet, both companies with annual grosses in the billions, hail from the same small town of Warsaw, Indiana. Defendants liken the relationship between the companies to that between historic feud-

## 2. Events Leading to the Sale of FMC and F&S

Mr. Fields was the founder and sole owner and director of FMC. FMC entered into a Distribution Agreement with Biomet in 1994, making FMC an exclusive distributor of Biomet orthopaedic implants in Kentucky, West Virginia, Tennessee, and Southern Indiana.

Mr. Stallings began work for FMC as a sales associate in 1997. The employment agreement between Mr. Stallings and FMC contained a non-compete agreement which prohibited Mr. Stallings from competing against FMC for one (1) year after termination of Mr. Stallings' employment and from working or representing "any manufacturer that has been represented by FMC at any time during your tenure as an independent sales representative at FMC." (Doc. No. 24 Att. Ex. 1 Para. 4). Mr. Stallings was promoted to Sales Manager of FMC in 2000.

In 2003, Mr. Fields and Mr. Stallings created F&S to represent other product lines belonging to Biomet. Thereafter, F&S entered into an exclusive distributorship agreement with Biomet subsidiaries for the sale of biologic and sports medicine products.

On June 14, 2007, FMC and F&S agreed to leave Biomet to distribute for Zimmer U.S. The distribution agreement was structured as a buy-out: FMC, F&S, and Mr. Fields signed an Asset Purchase Agreement ("APA") with Zimmer U.S. under which Zimmer U.S. paid $11.1 million up front for the assets of FMC and F&S. Of that $11.1 million, Schedule 3.5 of the APA makes clear that over $9 million was allocated to the purchase of the goodwill of FMC, F&S, and Mr. Fields. Goodwill – the established knowledge and trust of customers in sales staff – is the most valuable commodity of orthopaedic implant distributors. Their sales staff are often

_____

partners the Hatfields and the McCoys.

present during surgery when orthopaedic products are implanted. Salespersons gain intimate knowledge of the unique preferences of individual surgeons and establish a personal rapport that is often a more important factor in what the surgeons buy than the orthopaedic products themselves.

Execution of the APA was expressly contingent on both Mr. Fields and Mr. Stallings signing Employment Agreements with Zimmer Melia. Mssrs. Fields and Stallings signed Employment Agreements with Zimmer Melia, and the APA was executed. The Employment Agreements stated that Mssrs. Fields and Stallings were to begin work for Zimmer Melia in 31 days. This was to allow Mssrs. Fields and Stallings to terminate their working relationship with Biomet, which required 30 days notice.

Mr. Stallings was not a signatory to the APA. He did, however, sign a Uniform Consent giving Mr. Fields authority to sign the APA on behalf of F&S.

On June 15, Mssrs. Fields and Stallings announced the sale of FMC and F&S to their sales staff. Michael Melia, President of Zimmer Melia, was present at this meeting, and positions were offered to the FMC staff with Zimmer Melia. The majority of FMC's sales associates signed Employment Agreements with Zimmer Melia. F&S sales associates were not universally offered positions, and very few ultimately signed on with Zimmer Melia. This was because Zimmer U.S. does not manufacture the biologic and sports medicine products which F&S sold for Biomet.

Upon learning of Zimmer's purchase of FMC and F&S, Biomet immediately attempted to regain Mssrs. Fields and Stallings as distributors for Biomet. Discussions were held between top Biomet executives and Mssrs. Fields and Stallings at the home of Mr. Fields on June 16 and

17, and Biomet made an aggressive pitch. Ultimately, Mr. Fields refused to leave Zimmer, but Mr. Stallings was convinced to go with Biomet. Mr. Stallings repudiated his Employment Agreement with Zimmer Melia at least by June 19, 2007, and he began to actively recruit his former sales associates with FMC and F&S to renege on their contracts with Zimmer Melia and join his new company, Stallings & Associates ("S&A"), created by Mr. Stallings to serve as an exclusive Biomet distributor in the same region formerly occupied by FMC and F&S. Mr. Stallings was largely successful in this regard: the majority of former sales associates with FMC and F&S reneged on their Zimmer Melia contracts and joined S&A.

As part of Mr. Stallings' contract to return to Biomet, Mr. Stallings gained indemnification in the event he was enjoined from working. This indemnity clause promised Mr. Stallings $100,000 for each month he was sidelined in the event of an injunction.

### 3. Restrictive Covenants in the APA

The APA contemplated three (3) restrictive covenants of note.

First, the APA required Mr. Fields to sign a Confidentiality and Non-Competition Agreement ("the Fields Non-compete"). In pertinent part, the Fields Non-Compete prohibited Mr. Fields from soliciting customers or sales associates or otherwise competing with Zimmer for a period of two (2) years from the date of termination of employment with Zimmer Melia. Consideration for the Fields Non-Compete was itemized on Schedule 3.5 of the APA at $250,000.

Second, the APA was expressly conditional on both Mssrs. Fields and Stallings signing Employment Agreements with Zimmer Melia, and these contracts contained Covenants of Exclusive Employment, Not to Solicit Customers, Not to Solicit Other Sales Associates, and Not

to Compete ("Zimmer Non-competes").  Like the Fields Non-compete, these covenants prohibited Mssrs. Fields and Stallings from soliciting customers or sales associates or otherwise competing with Zimmer for a period of two (2) years from the date of termination of employment with Zimmer Melia.

Third, Paragraph 7.3 of the APA, entitled Sales Associate Restrictive Covenants, acknowledged that FMC and F&S held non-competition agreements signed by their sales associates ("FMC Non-competes")[4].  Paragraph 7.3 required Mr. Fields, FMC, and F&S to notify Zimmer immediately in the event of a known violation of any FMC Non-compete, and furthermore, Paragraph 7.3 empowered Zimmer to require the enforcement of any FMC Non-compete, provided that Zimmer underwrote the suit.  FMC Non-competes provided that FMC and F&S sales associates would not compete in the sale of medical implants or provide services for any rival manufacturer for a period of two (2) years from the date of termination of employment.  However, Paragraph 7.3 recognized that four (4) sales associates had FMC Non-competes that ran for a period of one (1) year only.  Mr. Stallings was one (1) of these four (4).

4.     **Kentucky State Suit**

In response to Mr. Stallings' repudiation of his Zimmer contract and arrangements to distribute for Biomet through S&A, Mr. Fields, FMC and F&S filed suit against Mr. Stallings for violation of his FMC Non-compete on July 3, 2008.  Zimmer underwrote this action in keeping with Paragraph 7.3 of the APA.  On July 12, 2007 the Kentucky court issued a restraining order that enjoined Mr. Stallings from serving as a Biomet distributor.  On May 27, 2008, the

---

[4] The term "FMC Non-compete" may be a misnomer in certain cases, namely, with regard to employees of F&S who did not sign employment agreements with FMC.  "FMC Non-compete" is used only for convenience to represent a restrictive covenant held by FMC or F&S.

Case 3:08-cv-00663   Document 46   Filed 08/21/08   Page 6 of 21 PageID #: 824

Kentucky state court issued a temporary injunction to the same effect (collectively, the "Kentucky Injunction") set to expire July 1, 2008, at the approximate end of the one (1) year term of Mr. Stallings' non-compete agreement with FMC. That date having passed, Mr. Stallings is no longer enjoined from working as a Biomet distributor under the terms of his FMC Non-compete. Under the terms of his injunction indemnification agreement with Biomet, Mr. Stallings was paid $1.2 million for the year that he was enjoined from working.

## III.    LEGAL STANDARD

The governing legal standard for a preliminary injunction motion requires consideration of four (4) factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction. Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp., 511 F.3d 535, 542 (6th Cir. 2007) (quoting Tumblebus Inc. v. Cranmer, 399 F.3d 754, 760 (6th Cir. 2005)); Memphis Planned Parenthood, Inv. v. Sundquist, 175 F.3d 456, 460 (6th Cir. 1999). These considerations are "factors to be balanced, not prerequisites that must be met." Certified Restoration, 511 F.3d at 542 (quoting Jones v. City of Monroe, Mich., 341 F.3d 474, 476 (6th Cir. 2003)).

## IV.    DISCUSSION

### 1.    Likelihood of Success on the Merits

Plaintiffs raise two (2) claims in their Motion for Preliminary Injunction: (1) breach of

contract, and (2), in the alternative, promissory estoppel.[5] Plaintiffs' claims boil down to the same allegation – that Mr. Stallings violated the terms of a non-compete by working for Biomet in competition with Zimmer within two (2) years of termination of his employment with Zimmer. The breach of contract claim is straightforward; Plaintiffs assert that the non-compete was part of a binding contract. The promissory estoppel claim simply couches the same facts in a different legal claim, alleging that Mr. Stallings made a promise not to compete with Zimmer for two years, that Zimmer relied on this promise in executing the APA, and that Mr. Stallings' violation of his promise would substantially undercut the value of the APA, for which Zimmer already paid $11.1 million up front.

### A.     *Breach of Contract*

Defendants do not contest that Mr. Stallings violated the terms of his Zimmer Non-compete by contracting with Biomet, creating S&A, and soliciting sales associates away from Zimmer. Instead, Defendants argue that the Zimmer Non-compete is unenforceable. The Court agrees.

Tennessee law distinguishes between types of non-competes. For purposes of this Order, two (2) kinds are of particular importance. First, Tennessee recognizes non-competes which are ancillary to a valid employment agreement. Vantage Tech., LLC v. Cross, 17 S.W.3d 637, 644 (Tenn. Ct. App. 1999); Hasty v. Rent-A-Driver, Inc., 671 S.W.2d 471, 472 (Tenn. 1984). Second, Tennessee recognizes non-competes which are ancillary to a valid agreement for sale of a business. Greene County Tire & Supply, Inc. v. Spurlin, 338 S.W.2d 597, 599-600 (Tenn.

---

[5] Per agreement of the parties as stipulated in the APA, these claims are to be resolved under Tennessee state law.

-8-

1960); Herbert v. W.G. Bush & Co., 298 S.W.2d 747, 751 (Tenn. Ct. App. 1956). The two (2) kinds of non-competes are treated differently by courts. See 6 WILLISTON ON CONTRACTS § 13:4 (4th ed. 2008); see, e.g., Hudgins v. Amerimax Fabricated Prods., Inc., 551 S.E.2d 393, 395 (Ga. Ct. App. 2001) ("[f]or purposes of judicial consideration, restrictive covenants that are ancillary to the sale of a business and restrictive covenants that are ancillary to employment contracts are analyzed in fundamentally different ways"); DAR & Assocs., Inc. v. Uniforce Servs., Inc., 37 F. Supp. 2d 192, 197 (E.D.N.Y. 1999).

i.     Employment Agreement Non-competes

In Tennessee, non-competes ancillary to an employment agreement are viewed less favorably than those ancillary to the sale of a business. 21 TENN. PRAC. CONTRACT LAW AND PRACTICE § 7:34 (2007). The typically cited reasons for the distinction are that employment contracts are frequently signed under conditions of unequal bargaining power, and that the burden of non-competition is likely greater on an employee than the seller of a business. Id.

In deciding the enforceability of an employment agreement non-compete, Tennessee courts look to the reasonableness of the restriction as determined by the following factors: "the consideration supporting the agreements; the threatened danger to the employer in the absence of such an agreement; the economic hardship imposed on the employee by such a covenant; and whether or not such a covenant should be inimical to public interest." Vantage Tech., 17 S.W.3d at 644 (quoting Allright Auto Parks, Inc. v. Berry, 409 S.W.2d 361, 363 (1966)).

Tennessee law also requires that the employer have a legitimate business interest in the non-compete. Id. Sometimes this requirement is treated as a threshold question, id.; other times, the requirement is located within the second factor cited above – the "threatened danger to the

-9-

employer," Hasty, 671 S.W.2d at 472. Either way, the requirement is the same. It is a condition necessary to the enforcement of an employment agreement non-compete that either: (1) the employer provided the employee with specialized training; or (2) the employee was given access to trade or business secrets, or other confidential information, in the course of employment; or (3) the employer's customers generally associate the employer's business with the employee, such that the employee becomes 'the face of the business.' Vantage Tech., 17 S.W.3d at 644; Hasty, 671 S.W.2d at 472. In short, it must be the case that the employee would be in a position to harm the employer not merely by competing, but specifically because of the fact of prior employment with the employer.

ii.    Sale of Business Non-competes

In contrast, non-competes ancillary to the sale of a business are subjected to less intensive scrutiny. Greene County, 338 S.W.2d at 599-600 ("[g]enerally speaking, 'a covenant which is incidental to the sale and transfer of a trade or business, and which purports to bind the seller not to engage in the same business in competition with the purchaser, is lawful and enforceable'" (internal citation omitted)). Courts have generally recognized that restrictive covenants are often necessary to secure value in the purchase of a business, particularly where substantial consideration is given for the business's good will. See, e.g., Herbert v. W.G. Bush & Co., 298 S.W.2d 747, 751 (Tenn. Ct. App. 1956); Decker, Berta & Co., Ltd. v. Berta, 587 N.E.2d 72 (Ill. Ct. App. 1992) (a non-compete ancillary to the sale of a business "ensures that the former owner will not walk away from the sale with the company's customers and goodwill, leaving the buyer with an acquisition that turns out to be only chimerical" (internal citation omitted)). Tennessee courts require only that the restraint be reasonable, which is "determined

-10-

by reference to the nature of the business, the manner in which it has been conducted and its territorial extent." Greene County, 338 S.W.2d at 600.

### iii.    The Case of Mr. Stallings

Mr. Stallings never worked for Zimmer Melia; the Employment Agreement that he signed on July 14, 2007, was not due to go into effect for 31 days, and only five (5) days later, by July 19, Mr. Stallings had repudiated his Zimmer contract. As a result, Mr. Stallings never gained any training, confidential information, or customer goodwill from Zimmer such that Zimmer required protection in the form of an employment agreement restrictive covenant against Mr. Stallings. Insofar as the Zimmer Non-compete is viewed only as an employment agreement non-compete, it is unenforceable.

The question is thus whether a non-compete ancillary to the sale of a business may be attributed to Mr. Stallings for the period of two (2) years beyond termination of his employment with Zimmer. It is clearly the case that Mr. Stallings did not sign a non-compete as part of the APA. Mr. Fields did, and separate consideration was paid for that agreement. But the signature of Mr. Fields represented Mr. Fields alone, and no parallel instrument was drawn up with regard to Mr. Stallings.

Plaintiffs are not clear as to exactly how, and under what authority, this Court is to find a non-compete ancillary to the sale of F&S running against Mr. Stallings. Plaintiffs seem to argue that it is no matter that Mr. Stallings did not sign a covenant akin to the Fields Non-compete because Greene County – in which the restrictive covenant was upheld – is directly on point. Apparently, Plaintiffs read Greene County as holding that a non-compete attaches automatically to a principal shareholder in the sale of a business. Greene County does not so hold. In Greene

-11-

County, the defendant had signed a restrictive covenant that was clearly ancillary to the sale of defendant's business:

> [a]s part of the consideration [for sale of the business], Marshall and Spurlin [defendant] agreed, *and it was so written into the contract with each*, as well as the corporation, signed, that they would not engage directly or indirectly, either for themselves or as the agents or servants, in a similar business . . . for five years within a radius of 100 miles of Greeneville where the selling corporation's business was located . . .

338 S.W.2d at 599 (emphasis added). The Court specifically found "[q]uite material . . . the fact that Spurlin, for a valuable consideration, entered into this agreement which he now seeks to repudiate." Id. At 600. Plaintiffs in this case are thus without substantial argument for the existence of an enforceable non-compete

In the absence of guidance from the Plaintiffs, the Court is able to conceive of two (2) possible arguments for the finding of a non-compete ancillary to the sale of F&S running against Mr. Stallings: (1) the Zimmer Non-compete may be viewed as ancillary to the sale of F&S; or (2) Zimmer's purchase of the goodwill of F&S contained an implicit covenant not to compete. The Court considers each of these in turn. Ultimately, both are unavailing.

a.      *The Zimmer Non-compete As Ancillary to the APA*

This proposition requires two logical moves: (1) the Zimmer Non-compete must be interpreted as part of the APA, and (2) as part of the APA, the Zimmer Non-compete must be interpreted as ancillary to that contract, and not Mr. Stallings' Employment Agreement with Zimmer.

The first move is unproblematic. Under Tennessee law, "where an executed agreement refers to other documents and makes the conditions of the other documents part of the executed

-12-

agreement, they will be interpreted together as the agreement of the parties." Burns v. Temperature Control Co., 371 S.W.2d 804, 805 (Tenn. Ct. App. 1963); accord Hardeman County Bank v. Stallings, 917 S.W.2d 695, 698 (Tenn. Ct. App. 1995). By the terms of the APA, execution of that document was expressly contingent on Mr. Stallings signing an Employment Agreement with Zimmer. As a result, Mr. Stallings' Zimmer Non-compete must be read as part of the APA.

The second move, however, is more difficult. In every Tennessee case in which a restrictive covenant ancillary to the sale of a business has been considered, the party against whom the covenant was enforced had signed a non-compete that was unambiguously part of the sale of the business. See Butts v. Birdwell, 503 S.W.2d 930 (Tenn. Ct. App. 1973); Greene County, 338 S.W.2d 597; Herbert v. W.G. Bush & Co., 298 S.W.2d 747 (1956); Scott v. McReynolds, 255 S.W.2d 401 (1952); Barner v. Reggiano, 222 S.W.2d 672 (1948); Baird v. Smith, 161 S.W. 492 (Tenn. 1913); Bradford & Carson v. Montgomery Furniture Co., 92 S.W. 1104, 1109 (Tenn. 1906); Jackson v. Byrnes, 54 S.W.2d 984 (Tenn. 1900). There is no Tennessee precedent of a non-compete within an employment agreement being treated as one ancillary to the sale of a business.

In a few scattered cases, the courts of other states have found an employee's restrictive covenant ancillary to the sale of a business where employees changed hands in the course of a corporate buy-out. See, e.g., Alexander & Alexander, Inc. v. Wohlman, 578 P.2d 530 (Wash. Ct. App. 1978); H.B.G. Corp. v. Houbout, 367 N.E.2d 432 (Ill. Ct. App. 1977). However, none of these cases are binding upon this Court, and the Court declines to follow their example.

In reaching this decision, the Court first notes that "insofar as non-competitive covenants

-13-

are concerned . . . each case must stand or fall on its own merits," Ramsey v. Mutual Supply Co., 427 S.W.2d 849, 853 (Tenn. Ct. App. 1968), and the controlling factor for interpretation is, to the extent it is discernible, the intention of the parties. Planters Gin Co. v. Federal Compress & Warehouse Co., Inc., 78 S.W.3d 885, 889-90 (Tenn. 2002). In the exemplary cases of Wohlman and Houbout, cited above, the facts were different from those of the present case in important respects. The Wolman defendant never executed an employment agreement; he simply signed a non-compete and then began working for the plaintiffs. 578 P.2d at 534. Moreover, this non-compete was the only document protecting the plaintiffs' purchase of the seller's goodwill. Id. at 533-34. In Houbout, while the non-compete at issue was within an employment agreement, it was clear that, as in Wolman, this non-compete was the only covenant protecting the goodwill acquired by plaintiff. 367 N.E.2d at 957-959.

The present case is materially different on the facts. Under Mr. Stallings' FMC Non-compete, Zimmer was protected against the competition of Mr. Stallings for a period of one (1) year following the termination of his employment. Zimmer was aware of this fact, as the provision of the APA which detailed Zimmer's right to enforce the FMC Non-competes expressly acknowledged that four (4) FMC employees were covered by one (1) year non-competes only. If Zimmer had wanted a two (2) year non-compete running against Mr. Stallings, it could have made explicit arrangements as it did with Mr. Fields in the Fields Non-compete. The Fields Non-compete is telling because Mr. Fields, like Mr. Stallings, also had a two (2) year Zimmer Non-compete. If Zimmer had considered the Zimmer Non-competes to be sufficient as ancillary to the APA, it would not have spent $250,000 for a duplicative signing from Mr. Fields. What emerges from this cluster of facts is that Zimmer intended to purchase a

-14-

one (1) year non-compete from Mr. Stallings as ancillary to the APA, and required Mr. Stallings

to sign a separate non-compete ancillary to his employment agreement. Zimmer was not willing

to pay for a second year running against Mr. Stallings as attached to the APA. It thus appears

that the intention of the parties was to bind Mr. Stallings to a restrictive covenant running from

the date of termination of Mr. Stallings' employment with Zimmer for a period of one (1), not

(2), years. Where the intentions of the parties were plain at the time the APA was executed, the

Court will not grant Plaintiffs' ex post request for a year more than they bargained for.

b.    *An Implied Restrictive Covenant*

There is conflicting authority on the question of whether or not restrictive covenants

ancillary to the sale of a business may be implied from the sale of goodwill in particular.

Goodwill is commonly defined as "[t]he probability that the old customers will resort to the old

place." 6 Williston on Contracts § 13:8 (4th ed. 2008) (quoting Liquidators of Nicholson Pub.

Co. v. ES Upton Printing Co., 93 So. 91 (La. 1922)). Clearly, a purchase of goodwill may be

undermined if the seller competes for the old customers in the old place. Nonetheless, there is

long-standing authority in Tennessee that "a sale merely of good will does not, of itself, imply a

contract on the part of the vendor to not engage again in a similar business . . . .Suffice it to say

that an obligation not to enter into a similar business will not be implied from a mere sale and

transfer of good will." Jackson v. Byrnes, 54 S.W.2d 984, 985 (Tenn. 1900). On the other hand,

there is authority behind the proposition that a purchase of goodwill entitles the buyer to those

implied restrictive covenants that are necessary to secure the benefit of the bargain. 6 Williston

on Contracts § 13:8 (4th ed. 2008).

However, the Court finds it unnecessary to resolve this tension, because, even supposing

-15-

that implied restrictive covenants are enforceable, "to the extent that the parties make express promises . . . the promisor's undertaking should be enforceable, without the need for the court to consider any implied promises." Id. The Court finds that, in the course of the APA, express promises were made regarding non-competition. These express promises are contained within the Fields Non-compete, the Zimmer Non-competes of Mssrs. Field and Stallings, and the FMC Non-competes of Mr. Stallings and others. The sum total of these promises prohibited Mr. Stallings from competing with Zimmer for one (1) year after termination of his employment with FMC, and, in the event that he worked for Zimmer, for two (2) years after his employment with Zimmer. Because Mr. Stallings never worked for Zimmer, the latter promise is unenforceable, and Zimmer is left with an enforceable promise running for one (1) year. Under these circumstances, where the parties made express agreements concerning non-competition in the sale of a business, the Court will not apply an implied restrictive covenant.

For these reasons, the Court determines that Zimmer has no enforceable breach of contract claim against Mr. Stallings. The enforceable FMC Non-compete running against Mr. Stallings has reached the end of its term, and Mr. Stallings' Zimmer Non-compete is unenforceable.

### B. *Promissory Estoppel*

Promissory estoppel is the doctrine that "a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." Barnes & Robinson Co., Inc. v. OneSource Facility Servs., Inc., 195 S.W.3d 637, 645 (Tenn. Ct. App. 2006) (quoting Calabro v. Calabro, 15 S.W.3d 873, 878

-16-

(Tenn. Ct. App. 1999) (citing <u>Amacher v. Brown-Forman Corp.</u>, 286 S.W.2d 480, 482 (Tenn. Ct. App. 1991) (quoting Restatement (Second) of Contracts § 90))). The essential elements of a promissory estoppel claim are: (1) a promise made by the defendant with the reasonable expectation of inducing some action or forbearance; (2) reasonable reliance on the promise by the plaintiff; (3) as a result of which, the plaintiff suffers some tangible detriment. <u>Id.</u> at 654-46.

Plaintiffs promissory estoppel claim construes the facts as follows: (1) Mr. Stallings promised not to compete with Zimmer for a period of (2) years after termination of his employment with Zimmer; (2) Zimmer relied on that promise in executing the APA; and (3) Plaintiffs will be deprived a substantial piece of the value of the $11.1 million which they paid up front in the APA if Mr. Stallings competes.

The problem with Plaintiffs' promissory estoppel claim is essentially the same as that which plagued Plaintiffs claim for breach of contract: Mr. Stallings never signed a restrictive covenant ancillary to the sale of a business which contained a restrictive covenant against competition for two (2) years after employment with Zimmer. Mr. Stallings signed a Zimmer Non-compete. This document was a promise that Mr. Stallings would not compete with Zimmer for a two (2) year period after Mr. Stallings had worked for Zimmer. Mr. Stallings never promised not to compete with Zimmer for a two (2) year period after execution of the APA.

Plaintiffs' promissory estoppel claim requires viewing either Mr. Stallings' Zimmer Non-compete, or the sale of F&S itself, as a promise not to compete with Zimmer for two (2) years after execution of the APA. Here, the Court's breach of contract analysis maps directly onto Plaintiffs' promissory estoppel claim. Mr. Stallings' Zimmer Non-compete cannot be interpreted as a promise not to compete for two (2) years after the sale of the business because the sum total

-17-

of documents associated within the APA dictate otherwise. Mr. Stallings' Zimmer Non-compete was a promise ancillary to his employment with Zimmer. Mr. Fields made such a promise as well, but apparently because Zimmer did not acquire an FMC Non-compete against Mr. Fields, Zimmer paid for a separate promise from Mr. Fields that would run from execution of the APA. Zimmer did not request or pay for such a promise from Mr. Stallings; Zimmer had an FMC Non-compete against Mr. Stallings for one (1) year from execution of the APA, and Zimmer was apparently uninterested in paying for another. The express provisions of the APA thus argue against the interpretation of Mr. Stallings Zimmer Non-compete as a promise not to compete running for two (2) years from execution of the APA.

Similarly, the promise which the Plaintiffs seek cannot be located in the sale of F&S itself. Where Zimmer required Mr. Fields to sign the Fields Non-compete and paid $250,000 for that promise, it is evident that Zimmer did not consider the purchase of goodwill from FMC and F&S to contain any inherent promises not to compete. Under these circumstances, it is unreasonable to suppose that any of the parties to the APA considered the sale of F&S to contain a promise not to compete running against Mr. Stallings alone.

For these reasons, the Court finds that Mr. Stallings never promised to restrain from competition with Zimmer for two (2) years beginning with the sale of F&S. As a result, Plaintiffs' promissory estoppel claim cannot succeed on the merits.

### C.  *Preliminary Injunction Denied*

The Sixth Circuit has held that "a finding that there is simply no likelihood of success on the merits is usually fatal." Gonzalez v. Nat'l Bd. Of Med. Exam'rs, 225 F.3d 620, 625 (6th Cir. 2000); accord Michigan State AFL-CIO v. Miller, 103 F.3d 1240, 1249 (6th Cir. 1997).

-18-

Plaintiffs in this case have no likelihood of success on the merits, as discussed above. For this reason, the Court denies Plaintiffs Motion: a preliminary injunction against Mr. Stallings for one year would essentially be giving the Plaintiffs more than they explicitly bargained for.

However, while district courts are not required to make findings under each of the four (4) factors of the preliminary injunction analysis where fewer factors are dispositive, In re Delorean Motor Co., 755 F.2d 1223, 1228 (6th Cir. 1985) (citing United States v. School District of Ferndale, 577 F.2d 1339, 1352 (6th Cir. 1978)), the Court nevertheless finds value in discussing the remaining factors in this case in the event of appeal. Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp., 511 F.3d 535, 542 (6th Cir. 2007) (quoting Leary v. Daeschner, 228 F.3d 729, 739 n.3 (6th Cir. 2000)). For that reason, the remaining three (3) factors are analyzed below.

### B.  Irreparable Harm

Plaintiffs can succeed under this factor by showing that "the nature of the plaintiff's loss would make the damages difficult to calculate." Certified Restoration, 511 F.3d at 550 (quoting Basicomputer Corp. v. Scott, 973 F.2d 507, 511 (6th Cir. 1992)).

The irreparable harm pled by Plaintiffs is the competition of Mr. Stallings. Mr. Stallings is a highly valued salesman and manager of sales associates. His goodwill was worth millions of dollars to both Zimmer and Biomet in their respective contracts with him. Inferring from the value placed upon this goodwill by the market, the Court concludes that Mr. Stallings would have some success in taking business away from Zimmer if allowed to compete with Zimmer in the coming year. However, the Court has no way of calculating with precision – either now or ex post – just what percent of Zimmer's lost profits might be attributed to the competition of Mr.

-19-

Stallings. For this reason, the Court finds that Plaintiffs have made out a claim of irreparable harm.

### C. Harm to Mr. Stallings

Under the terms of Mr. Stallings' contract with Biomet, Mr. Stallings is indemnified $100,000 for every month that he is enjoined from working. Mr. Stallings collected $1.2 million under this provision during the past year while the Kentucky injunction was in place. Mr. Stallings would receive the same compensation were the Court to grant Plaintiffs' Motion in this case. This $1.2 million exceeds the compensation which Mr. Stallings could earn as salary if permitted to work for Biomet during the next year. Under these circumstances, the Court cannot find harm to Mr. Stallings in the event of an injunction against him.

### D. Public Interest

The Court finds that the public interest does not weigh in either party's favor in this case. The public has an interest in free trade which counsels against restraints on "ordinary competition," Hasty, 671 S.W.2d at 473, but the public also has countervailing interests in holding parties to their stated intentions, and in permitting parties to sell property on the terms most advantageous to themselves." Greene County, 338 S.W.2d at 600 (intental citation omitted). Under these circumstances, the Court finds that analysis under this factor lends no weight to the Court's decision in this case.

## V. CONCLUSION

For the above-stated reasons, the Court finds that: (1) Plaintiffs claims of breach of contract and promissory estoppel have no likelihood of success on the merits, and therefore,

-20-

although (2) Plaintiffs have shown irreparable harm, (3) an absence of harm to the Defendants, and (4) the public interest leans in neither direction, (5) Plaintiffs' Motion is **DENIED**.

It is so ORDERED.

Entered this____21ˢᵗ____day of August, 2008.


JOHN T. NIXON, SENIOR JUDGE
UNITED STATES DISTRICT COURT

-21-